**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN J. MANLEY d/b/a<br>CHICAGO MARINE TOWING, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-cv-5551 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| BOAT/U.S., INC., a Virginia corporation,<br>GREAT LAKES REPAIR, INC., d/b/a<br>GREAT LAKES TOWING & REPAIR,<br>a Michigan corporation, and RICHARD N.<br>LENARDSON, an individual and resident<br>of Michigan, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendant Boat U.S., Inc.'s motion for summary judgment [61] and

Defendants Great Lakes Repair, Inc. and Richard N. Lenardson's motion for summary judgment

[62]. For the reasons that follow, Defendants' motions for summary judgment are granted as to

Plaintiff's claim for intentional interference with prospective economic advantage (Count III)

and Plaintiff's claim for defamation *per quod* (Count V). Summary judgment is denied as to

Plaintiff's claim for breach of contract for wrongful termination (Count I), breach of implied

covenant of good faith and fair dealing (Count II), and defamation *per se* (Count IV). This case

is set for further status hearing on January 24, 2017 at 9:00 a.m.

**I.     Background**

**A.     Factual Background**

The Court takes the relevant facts from Boat U.S.'s Local Rule 56.1 Statement of

Material Facts [61-2] and supporting exhibits [61-3]. Plaintiff failed to file a timely response to

Defendants' motions or Boat U.S.'s Local Rule 56.1 statement [see 72]. Therefore, pursuant to Local Rule 56.1(b)(3)(C), Boat U.S.'s fact statements are deemed admitted. N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); see also *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (affirming district court's decision to admit the facts set forth in moving party's Local Rule 56.1 submission where nonmovant failed to timely respond or submit its own Local Rule 56.1 statement); *De v. City of Chicago*, 912 F. Supp. 2d 709, 712–13 (N.D. Ill. 2012) ("The Seventh Circuit has repeatedly held that a district court has broad discretion to require strict compliance with Local Rule 56.1." (citation and internal quotation marks omitted)).

Plaintiff John J. Manley d/b/a Chicago Marine Towing ("Chicago Marine") is an Illinois corporation located in Chicago, Illinois, which provides marine towing and salvage services. [61-2, at ¶ 1.] Boat/U.S., Inc. ("Boat U.S.") is a Virginia corporation that provides water towing services, 24-hour dispatch service, and insurance coverage for recreational boaters. [*Id.* at ¶ 2.] Defendant Richard Lenardson is the owner of Defendant Great Lakes Repair d/b/a Great Lakes Towing & Repair ("Great Lakes Repair"); both Lenardson and Great Lakes Repair (collectively, "the Great Lakes Defendants") are citizens of Michigan. [*Id.* at ¶ 3–4.] Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, the Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

On or around February 5, 2009, Chicago Marine entered into an agreement with Boat U.S. [*Id.* at ¶ 6.] Pursuant to the agreement, Chicago Marine was a Boat U.S.-authorized marine towing company. The agreement provided that it would remain in effect until November 30, 2013, unless Chicago Marine breached Section I, Items 3, 4, 9, 10, or 11 of the agreement,

thereby permitting Boat U.S. to terminate the agreement by "delivering written notice of proposed termination." [*Id.* at ¶ 7; *see also* 1, at Exhibit A, Section I, Item 14(b).] Section I, Item 10 of the agreement states that both parties to the agreement "shall comply with all applicable federal, state and local laws, regulations, ordinances, and rules." Further, Section I, Item 14(f) of the agreement provides that, with certain exceptions, "any party which is delivered written notice of a breach and subsequent Termination under this Agreement may within 10 days of such notice request a hearing by the Termination Review Board."

On July 1, 2012, Boat U.S. dispatched Chicago Marine to assist distressed boaters Nathan Locher and his girlfriend Laurie Jagla, whose powerboat had been run aground at or near Wells Beach, Indiana. [61-2, at ¶ 10.] Albert Bartkus ("Bartkus"), one of Chicago Marine's employees at that time, drove a Chicago Marine towboat to the location of Locher's grounded vessel. [*Id.* at ¶ 11.] When Bartkus arrived, Locher and Jagla were not on the boat, and there was a crowd of people around the boat on the beach. [*Id.* at ¶ 12.] Bartkus met and spoke with Locher and Jagla on the shore. [*Id.* at ¶ 13.] In Bartkus's view, they were coherent and cooperative.[1] [*Id.* at ¶ 14.] Bartkus had Locher sign a contract for salvage but did not discuss any associated charges. [*Id.* at ¶ 15.] The contract for salvage signed by Locher stated at the top that Chicago Marine was "A TowboatU.S. Company." [*Id.* at ¶ 16.] Bartkus freed Locher's grounded boat, and Manley instructed him via phone to tow the boat to Crowley's Yacht Yard. [*Id.* at ¶ 17.] Chicago Marine asserted a high-priority possessory maritime lien on Locher's boat and towed it to Crowley's after learning that it was insured by American Family Insurance due to Manley's claimed difficulty obtaining payment from that insurer. [*Id.* at ¶ 18.] After Bartkus towed Locher's boat to Crowley's, he had no further contact with Locher or Jagla. [*Id.* at ¶ 19.]

---

[1] Although Chicago Marine has admitted to this fact, the transcript of Manley's deposition also shows that Manley testified that Locher and Jagla were "drunk and otherwise impaired," as discussed further below. [*See* 61-3, Exhibit 2 (Manley Deposition), at 63.]

Manley drove a second towboat to the grounding site to provide Locher and Jagla transportation to their boat or to their home. [*Id.* at ¶ 20.] He arrived after Bartkus completed the salvage and idled his boat in the shallow water just off shore as Locher and Jagla waded into the water and boarded Manley's boat. [*Id.* at ¶ 21.] Locher and Jagla asked to remove property from their boat and wanted to know where their boat was being towed. [*Id.* at ¶¶ 22–23.] However, Manley testified that he said, "I'm not going to tell you [where Chicago Marine is taking your boat] right now * * * you'll get to your boat in good time." [61-3, Exhibit 2 (Manley Deposition), at 73.] According to Manley, he responded to their demands to be taken to their boat in this manner because Locher and Jagla were "drunk and otherwise impaired." [*Id.* at 63.] Relying on his training as a former police officer, Manley guessed that they had been using methamphetamines. [*Id.* at 66, 74.] He based this conclusion on their inability to sit still, their continuous yelling and screaming, their inability to absorb information, their rapid, unpredictable eye movements, and their jerkiness of limb movements, but did not administer any type of test to determine if they were in fact substance impaired. [*Id.* at 69–70.] In Manley's view, they would "[a]bsolutely not" have been competent to operate a motor vehicle in their current state. [*Id.* at 70.]

Manley testified that he "didn't want them to go down to Crowley's and cause problems for Crowley's personnel." [*Id.* at 74; see also *id.* at 64 ("I was not going to take a couple of drunken fools to Crowley's Yacht Yard when they're, one, totally out of their minds, and two, threatening violence."] Manley stated that he gave Locher his card and told him to call tomorrow and that "[t]omorrow morning we'll get this all organized, we'll get the stuff off your boat." [Id. at 74.] Manley further testified that "at one point" he said, "I'll tell you what * * * [w]e'll take you home, get whatever you need, we'll drive you down to your boat to get whatever

you need off your boat, all right." [*Id.* at 75.] Manley claimed that he thought this plan would have given him time to "prepare things at Crowley's for their arrival," maybe "get a couple of coppers over there from the fourth district if necessary," and that he was trying to "stretch some time out" in hopes that "they would have calmed down by that time." [Id.] However, Manley testified that Locher and Jagla declined this offer and "didn't want [Chicago Marine] to give them a ride anywhere." [*Id.*]

Manley further testified that Locher was threatening and abusive, threatened to "beat the shit" out of him and to "throw you over the side, take your boat and get mine." [*Id.* at 73, 76.] Locher never raised his hand towards Manley, never came at Manley, never tried to push, touch, or grab Manley, and never reached for or threatened to use a weapon against Manley. [61-2, at ¶ 25.] However, Manley testified that he knew Locher had the ability to follow through with this threats because he was approximately 6 foot 2 inches tall, 220 pounds, and muscular. [61-3, Exhibit 2 (Manley Deposition), at 78.] Manley also testified that he had a genuine concern that Locher was going to threaten his life. [*Id.* at 78.] In response to Locher's verbal threats, Manley stepped into the pilothouse, opened a briefcase he brought with him, removed a Sig 380 automatic handgun, inserted an ammunition clip, stepped out of the pilothouse, pointed the gun in the general direction of Locher and Jagla for 15-20 seconds, and said, "if you move your ass off that transom I'm going to shoot you." [*Id.* at ¶ 26; see also 61-3, Exhibit 2 (Manley Deposition), at 79, 83, 87.] Locher and Jagla remained seated on the transom, Manley tucked the loaded handgun into the back of his belt under his jacket, and he dropped Locher and Jagla off at their home port, Marina Shores. [61-2, at ¶ 27.] Locher was not told the location of his boat and was not given access to his boat and property until the following day, when Manley contacted him pretending to be someone else. [*Id.* at ¶ 28.]

On July 2, 2012, Boat U.S. received complaints from Locher and his insurer, American Family Insurance, regarding Manley's handling of the July 1, 2012 salvage operation and about being denied access to Locher's vessel. [*Id.* at ¶ 29.] Boat U.S. conducted a thorough investigation of the complaints, which included interviews with Locher, Jagla, and Manley, and consultation with outside legal counsel. [*Id.* at ¶ 30.] Based on the investigation, on July 23, 2012, Boat U.S. delivered to Chicago Marine a letter terminating the agreement, effective immediately. [*Id.* at ¶ 31.] The letter set forth various grounds for termination, including but not limited to Chicago Marine's breach of Section I, Item 10 – "Compliance With Law" of the agreement. [*Id.* at ¶ 31.] The termination letter stated:

> [Chicago Marine] materially breached [Section I, Item 10] when it failed to comply with the law of salvage. A salvor who has earned the right to a salvage award through successful voluntary salvage services to a vessel in peril has a high-priority possessory, preferred maritime lien on the vessel. See 46 U.S.C. § 31301(5)(F) (1993); The FAIRFIELD, 30 F. 700 (D. Ga. 1887). A salvor in possession of a vessel is not bound to surrender it on demand to the owner until a reasonable security is provided. But, the salvor must move with all deliberate speed to either arrange for the posting of security or bring an action *in rem* against the vessel to foreclose his lien (turning the vessel over to the U.S. Marshall). *However, it is against the law for the salvor to deny the owner or his agents (i.e., insurer) access to his vessel or property to inspect or preserve it.* The ALCAZAR, 227 F. 633 (D.N.Y. 1915), See also Martin J. Norris, THE LAW OF SALVAGE (1958) § § 150-154.
>
> [Chicago Marine's] admitted refusal to immediately tell Mr. Locher of the location of his boat and admitted refusal to immediately allow Mr. Locher or his agents access to his boat (until a later time determined by [Chicago Marine]) is a material violation of the law of salvage, as outlined above.
>
> It is also reasonable to conclude [Chicago Marine's] refusal to tell Mr. Locher the location of his boat or to allow him access to his boat was the primary catalyst for any subsequent conflict, including [Chicago Marine's] admitted use of a firearm against the boater during service.

[1, Exhibit D, at 1–2.]

Chicago Marine did not request a hearing by the Termination Review Board pursuant to Section I, Item 14(f) of the agreement. [61-2, at ¶¶ 32–33.] After terminating the agreement with Chicago Marine, Boat U.S. contracted with Lenardson and Great Lakes Repair to provide towing services in the area previously assigned to Chicago Marine under the agreement. [*Id.* at ¶ 34.]

In January of 2013, Boat U.S. was an exhibitor at the Chicago Boat Sports & RV Show (the "Chicago Boat Show"), where it had a booth at which its representatives promoted Boat U.S.'s services and products. Lenardson was one of the Boat U.S. representatives who manned the Boat U.S. booth at the Chicago Boat Show. Keith Pearson, who was working for Chicago Marine as a subcontractor and is listed in the agreement as an "Authorized Captain" of Chicago Marine's towboats used to provide towing services under the agreement, attended the Chicago Boat Show. [See *id.* at ¶¶ 35–37.] According to Pearson, he spoke with Lenardson and told him that he was working for Chicago Marine Towing. [61-3, Exhibit 4 (Pearson Deposition), at 23.] The complaint alleges that in speaking with Pearson, Lenardson made false statements about Chicago Marine. Pearson testified in his deposition that Lenardson said Chicago Marine was "out of business" and that Manley "lost his license," which Pearson assumed referred to his captain's license. [*Id.* at 23, 25.] According to Pearson, other people nearby overheard Lenardson's statements about Chicago Marine, including Peter Thompson, who was another Boat U.S. representative at the booth, two marketing representatives from Boat U.S., and Pearson's son. [*Id.* at 32–33.] Pearson further testified that he did not believe the false statements that Lenardson allegedly made and that the alleged statements did not change or affect his opinion of Chicago Marine. [61-2, at ¶ 37; see also 61-3, at 27 ("No, it didn't change my opinion because I knew it wasn't true.").] Pearson did not mention Lenardson's alleged

statements to Manley until about a month later because he did not think they were important, and he only brought them up in passing conversation. [61-2, at ¶ 38.] Additionally, Pearson did not stop working with Chicago Marine because of Lenardson's alleged statements. [*Id.* at ¶ 39.]

The complaint also alleges that Lenardson made similar false statements on or around May 18, 2013, to officers at the United States Coast Guard stations in St. Joseph, Michigan and in Michigan City, Indiana. Manley testified in his deposition that he went to Michigan City to give out Chicago Marine's usual paperwork and the "lady sitting at the radio desk of the dispatch" said that "[we] got a call from St. Joe saying that * * * you were no longer operational. * * * They said [ ] the TowBoat/U.S. guy told them." [61-3, Exhibit 2 (Manley Deposition), at 126–127.] However, Manley did not know the name of the woman who relayed this information to him, the woman did not indicate whether she was present when these statements were made or whether someone told her about these statements, and she did not say who from St. Joseph made these statements. [*Id.* at 127–28.] According to Manley, his understanding was that the statements were made to the officers in St. Joseph by Lenardson since "the TowBoat/U.S. guy in St. Joe, * * * that is Mr. Lenardson." [*Id.* at 129.] However, Lenardson testified in his deposition that he did not make any such statements to Coast Guard officers in St. Joseph or Michigan City. [61-2, at ¶ 44; see also 61-3, Exhibit 5 (Lenardson Deposition), at 64.]

### B.    Procedural Background

On August 2, 2013, Chicago Marine filed a five-count complaint against Defendants alleging breach of contract for wrongful termination against Boat U.S. (Count I), breach of implied covenant of good faith and fair dealing against Boat U.S. (Count II), intentional interference with prospective economic advantage against Boat U.S. and the Great Lakes Defendants (Count III), defamation *per se* against Boat U.S. and the Great Lakes Defendants

(Count IV), and defamation *per quod* against Boat U.S. and the Great Lakes Defendants (Count V). Defendant Boat U.S. moved to dismiss Counts II, III, and V, and the Great Lakes Defendants moved to dismiss Counts III and V. The Court denied both motions on April 23, 2014. [21 (*Manley v. Boat/U.S. Inc.*, 2014 WL 1647117, at *1–2 (N.D. Ill. Apr. 23, 2014)).]

Boat U.S. filed its first amended answer [34] and raised nine counterclaims against Chicago Marine including breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), trademark infringement under 15 U.S.C. § 1114 (Count III) and under common law (Count VI), trademark dilution under 15 U.S.C. § 1125(c) (Count IV) and under the Illinois Trademark Registration and Protection Act, 765 ILCS 1036/65 (Count IX), false designation of origin under 15 U.S.C. § 1125(a) (Count V), unfair competition (Count VII), and violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* (Count VIII). Chicago Marine moved to dismiss many of Boat U.S.'s counterclaims. [35.] On December 12, 2014, the Court granted the motion to dismiss with respect to Count IX for trademark dilution under the Illinois statute and denied the motion with respect to all of the other counts. [46.] On May 29, 2015, Chicago Marine filed its second amended answer [51] to Defendants' counterclaims, raising sixteen affirmative defenses. On March 29, 2016, the Court granted Boat U.S.'s motion to strike [54] all of these affirmative defenses.[2] [66.]

On March 18, 2016, Boat U.S. filed a motion for summary judgment [61], which was joined by the Great Lakes Defendants [62]. The Court adopted the parties' proposed briefing schedule. [See 64.] However, despite having been granted an extension of time to file its response, Chicago Marine filed its response brief more than five months after the new deadline, without leave of the court. On November 28, 2016, the Court denied Chicago Marine's motion

---

[2] The Court gave Chicago Marine until April 29, 2016 to replead any affirmative defenses that were dismissed without prejudice, but Chicago Marine did not repleaded any affirmative defenses.

for leave to file its response brief *instanter* [72] and struck the response and supporting materials filed without leave of the court [60, 70]. [See 75.] Thus, the Court will decide Defendants' motions for summary judgment [61] and [62] based on Boat U.S.'s opening brief, Local Rule 56.1 Statement of Material Facts, and supporting exhibits.[3] See *Raymond*, 442 F.3d at 611 (holding that the district court did not abuse its discretion in refusing to accept a response brief filed three days late or in granting summary judgment without considering the late-filed response and accompanying Local Rule 56.1 statement).

## II.     Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

[3] In their motion for summary judgment [62], the Great Lakes Defendants do not offer any original arguments but merely "join and incorporate by reference all arguments and positions as to Counts II, IV, and V" from Boat U.S.'s motion for summary judgment.

bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir.2011) (quoting *Celotex Corp.,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016), cert. denied, 2016 WL 4367440 (U.S. Oct. 17, 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted), and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney*, 526 F.3d at 1104. Although a failure to timely respond to the moving party's Local Rule 56.1 statement results in "deeming admitted" the moving party's factual statements, a nonmovant's failure to respond to a summary judgment motion or failure to comply with Local Rule 56.1 does not, of course, automatically result in judgment for the movant. *Raymond*, 442 F.3d at 608. The ultimate burden of persuasion

remains on the moving party—Defendants, in this case—to show that it is entitled to judgment as a matter of law.

## III. Analysis

### 1. Count I: Wrongful Termination of Contract and Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

Chicago Marine alleges in Count I that Boat U.S. breached the agreement by terminating it prior to the November 20, 2013 expiration date. [See 1, at ¶¶ 80–84.] In Count II, Chicago Marine alleges that to the extent that the agreement granted Boat U.S. discretion in determining whether Chicago Marine met the terms, conditions, and service standards set forth in the agreement, Boat U.S. exercised its discretion in an arbitrary, capricious, and unreasonable manner. [See *id.* at ¶ 89.] As the Court discussed in denying Boat U.S.'s motion to dismiss, Virginia law applies to Chicago Marine's breach of contract claims (Count I and Count II) because of the choice-of-law provision in the agreement. [See 21, at 6–7; 1, Exhibit A, at ¶ 17(e).] Under Virginia law, a plaintiff may bring a common law claim for breach of contract based on a violation of the implied duty of good faith and fair dealing. See *Stoney Glen, LLC v. Southern Bank and Trust Co.*, 2013 WL 1897111, at 4 (E.D. Va. May 2, 2013) ("The United States Court of Appeals for the Fourth Circuit has consistently held that Virginia does recognize an implied duty of good faith and fair dealing in common law contracts."). As the Fourth Circuit explained in *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,* "although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." 156 F.3d 535, 542 (4th Cir. 1998).

Boat U.S. argues that it is entitled to summary judgment on Counts I and II because there is no genuine dispute that Chicago Marine violated salvage law when Manley refused to take

Locher and Jagla to their boat or tell them where it had been taken. In Boat U.S.'s view, since Chicago Marine violated the Compliance with Law provision in Section I, Item 10[4] of the agreement, Boat U.S. was permitted to terminate the contract and was therefore not in breach and did not exercise its discretion in an arbitrary manner. [See 61-2, at ¶ 7; 1, at Exhibit A, Section I, Item 14(b).]

To analyze this issue on a motion for summary judgment, the Court must consider whether a reasonable jury could find that Chicago Marine did not violate salvage law and thus, that Boat U.S. was not permitted to terminate the contract early. The law of salvage gives potential salvors incentives to render voluntary and effective aid to people and property in distress at sea. *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel*, 435 F.3d 521, 531 (4th Cir. 2006). Without some promise of compensation, salvors might be reluctant to undertake the often dangerous and costly efforts necessary to assist others. See *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 962 (4th Cir. 1999) ("Absent the promise of compensation and reward, we question whether a party, even one with the capacity to save the *Titanic* itself would incur the cost to do so."). Salvage law assumes that the property being salvaged is owned by another and thus that it has not been abandoned.[5] *Hener v. United States*, 525 F. Supp. 350, 356 (S.D.N.Y. 1981).

To secure payment of the salvage award, the law gives salvors a maritime lien on the salvaged property, which affords the salvor the right to take possession of the salvaged vessel for

---

[4] Section I, Item 10 (Compliance With Law) of the agreement states: "BoatU.S. and [Chicago Marine], together with respective employees, agents, representatives, and subcontractors, shall comply with all applicable federal, state and local laws, regulations, ordinances, and rules. BoatU.S. and Towing Company shall not engage in any price fixing, market allocation or other action illegal under anti-trust laws."

[5] This principle of salvage law is in contrast to the law of finds, under which the first person to reduce abandoned property to actual or constructive possession becomes its owner. *Hener*, 525 F. Supp. at 354.

the purpose of saving it from destruction, damage, or loss and to retain it until proper compensation has been paid. See *R.M.S. Titanic, Inc.*, 435 F.3d at 531; *Hener*, 525 F. Supp. at 356. The lien attaches to the exclusion of all others, including other potential salvors as well as the property's true owner. *R.M.S. Titanic, Inc.*, 435 F.3d at 531. Although the salvor is given this limited possessory interested in the salvaged property, the true owner is not divested of title to the property. *Id.* Further, the salvor's right to retain possession is not absolute and is instead "dependent upon conditions affecting the mutual rights of the salvor and owner." *The Alcazar*, 227 F. 633, 655 (E.D.N.C. 1915). "There seems to be no hard and fast rule prescribing the relative right and duty of the owner and the salvor in regard to the time of, or condition upon which, exclusive possession may be held by the salvor." *Id.* at 656. Courts have held that unless there is a probability that the owner would remove the vessel beyond the jurisdiction of the court, possession should be surrendered to the owner upon demand, "at least to the extent of permitting him to come on the vessel and aid in taking care of her." *Id.* However, "if the vessel is, at the time of the demand by the master, in such critical position that there may be risk of loss or damage to her unless the salvors are allowed to complete their operations, it seems that they may retain possession pending such completion." *Id.* (citation and internal quotation marks omitted). Salvage law imposes on salvors the "duties of good faith, honesty, and diligence in protecting the property in [the] salvors' care." See *R.M.S. Titanic, Inc.*, 435 F.3d at 532 (alteration in original) (citation and internal quotation marks omitted).

In the case at hand, it is undisputed that Chicago Marine had the right to assert a possessory maritime lien on Locher's boat. [See 61, at 6.] In moving for summary judgment, Boat U.S. contends that it was a violation of salvage law for Chicago Marine to take Locher's vessel to an undisclosed location and to deny Locher and Jagla access to their property.

However, it is not clear from the record that Chicago Marine deprived Locher and Jagla of access to their vessel in violation of salvage law. Chicago Marine had a duty to protect the vessel in its care and could retain possession pending completion of its salvage operation to prevent damage to the vessel. Here, there is at least a genuine dispute of material fact as to Locher's and Jagla's mental states at the time of the July 1, 2012 salvage operation. Although Boat U.S.'s fact statement that "Locher and his girlfriend were coherent and cooperative with Mr. Bartkus," [61-2, at ¶ 14] is deemed admitted, since Chicago Marine did not file a timely response to Defendants' motions or Boat U.S.'s Local Rule 56.1 statement, this does not conclusively resolve the matter. Manley testified that Locher and Jagla were "drunk and otherwise impaired" and that based on his observations and training as a former police officer, he thought they had been using methamphetamines. [61-3, Exhibit 2 (Manley Deposition), at 66, 73, 74.] In Manley's view, they would "[a]bsolutely not" have been competent to operate a motor vehicle in their current state. [*Id.* at 70.] A reasonable jury could determine that given Manley's account of Locher and Jagla's mental states and behavior and Chicago Marine's duty to protect the vessel, Chicago Marine properly retained possession of the salved vessel to prevent Locher and Jagla from damaging it. And if a reasonable jury adopted Manley's factual assessment, it could conclude that Chicago Marine did not breach salvage law and that Boat U.S.'s early termination of the agreement was not permitted and thus amounted to a breach of contract or an arbitrary exercise of discretion by Boat U.S. For these reasons, Boat U.S.'s motion for summary judgment on Counts I and II is denied.

## 2. Count III: Intentional Interference with Prospective Economic Advantage

In Count III, Chicago Marine alleges that on or around May 18, 2013, Lenardson made false statements about Chicago Marine to United States Coast Guard stations in St. Joseph,

Michigan and in Michigan City, Indiana. Lenardson allegedly said that Chicago Marine was out of business, that Manley had gone bankrupt, and that Manley's Coast Guard license had been revoked. [1, at ¶ 93.] Chicago Marine further alleges that Lenardson made these false statements while he was on board a Great Lakes Towing vessel that prominently displayed the logo and trademark of Boat U.S. and that identified Lenardson and Great Lakes Towing as representatives and/or agents of Boat U.S. [*Id.* at ¶ 78.]

As the Court previously discussed in ruling on Defendants' motions to dismiss [12] and [15], Illinois law applies to Chicago Marine's tort claims. [See 21, at 6–7 (citing *Westchester Fire Insurance Company v. Zurich American Insurance Co*., 2014 WL 1018115, at *2 (N.D. Ill. Mar. 12, 2014)).] To establish a tortious interference with economic advantage claim pursuant to Illinois law, a plaintiff must show: (1) "a reasonable expectancy of entering into a valid business relationship;" (2) "the defendant's knowledge of the expectancy;" (3) "an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy;" and (4) "damage to the plaintiff resulting from the defendant's interference." *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 508 (7th Cir. 2007) (quoting *Voyles v. Sandia Mortgage Corp.,* 751 N.E.2d 1126, 1133–34 (Ill. 2001)) (internal quotations omitted)).

Here, Chicago Marine asserts that when the United States Coast Guard stations in St. Joseph and Michigan City receive a call from a boater in need of towing or salvage services, they provide to the boater the name and number of a boat towing company in the area that can perform the necessary services. According to Chicago Marine, the Coast Guard stations provide this information on a rotating basis so that they do not favor one company over another. [1, at ¶ 92.] Chicago Marine alleges that Defendants intentionally and unjustifiably interfered with

Chicago Marine's prospective business relationships with customers in need of towing or salvage services by allegedly making these false statements to the United States Coast Guard stations in St. Joseph and Michigan City and that as a result, the Coast Guard stations stopped providing Chicago Marine's name and number to boaters in distress. [*Id.* at 93, 95–96.]

However, Chicago Marine offers no support for its allegation that Lenardson made these false statements to Coast Guard officers. Chicago Marine is unable to identify the woman at the United States Coast Guard station in Michigan City who allegedly told Manley about these statements. Nor is Chicago Marine able to identify the St. Joseph Coast Guard officers who told someone at the Michigan City station that "the TowBoat/U.S. guy" said that Chicago Marine was out of business. Aside from Manley's account of this string of anonymous messages resembling the childhood game of "telephone," Chicago Marine does not offer any evidence supporting its allegations that Defendants made these false statements. Although a plaintiff may defeat summary judgment with his own deposition, see *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664–65 (7th Cir. 2006), he cannot do so with a "deposition based on rumor or conjecture." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989). "Supporting and opposing affidavits [and depositions] shall be made on personal knowledge." *Id.* (quoting Fed.R.Civ.P. 56(e)) (internal quotation marks omitted). Thus, Chicago Marine's "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

Chicago Marine asks the Court to infer that Lenardson made the statements to the officers in St. Joseph because Manley testified that "the TowBoat/U.S. guy in St. Joe [is] Lenardson." [61-3, Exhibit 2 (Manley Deposition), at 129.] However, the Court cannot draw inferences that are "supported by only speculation or conjecture," *Williams*, 809 F.3d at 944 (7th Cir. 2016),

cert. denied, 2016 WL 4367440 (U.S. Oct. 17, 2016) (quoting *Argyropoulos*, 539 F.3d at 732) (internal citations omitted).  Further, Lenardson testified in his deposition that he did not make these statements to Coast Guard officers in St. Joseph or Michigan City.  [61-2, at ¶ 44; see also 61-3, Exhibit 5 (Lenardson Deposition), at 64.]  At summary judgment, when denial meets conjecture, denial prevails.  Thus, even viewing the evidence in the light most favorable to Chicago Marine, no reasonable jury could find that Defendants intentionally interfered with Chicago Marine's prospective economic advantage by making false statements about Chicago Marine to United States Coast Guard officers.  The Court grants summary judgment in favor of Defendants on Count III.

### 3.    Count IV: Defamation *Per Se* and Count V: Defamation *Per Quod*

To the extent that Count IV (Defamation *Per Se*) and Count V (Defamation *Per Quod*) are based on the statements that Lenardson allegedly made to unidentified United States Coast Guard officers, the Court grants summary judgment in favor of Defendants because, as discussed above, Chicago Marine offers no evidence supporting its conclusory allegations that Lenardson made these statements.  In Counts IV and V, Chicago Marine also alleges that Lenardson, individually and as owner of Great Lakes Repair and a representative and/or agent of Boat U.S., made defamatory statements about Chicago Marine at the Chicago Boat Show.  The parties dispute whether Lenardson made these false statements at the Chicago Boat Show.  Pearson testified at his deposition that Lenardson told him Chicago Marine was "out of business" and that Manley "lost his license," which Pearson assumed meant his captain's license.  [61-3, Exhibit 4 (Pearson Deposition), at 23.]  Lenardson testified at his deposition that he spoke with Pearson at the show but did not make the alleged statements and did not mention Chicago Marine Towing or Manley.  [61-3, Exhibit 5 (Lenardson Deposition), at 41–42, 44–45.]  In evaluating

Defendants' motion for summary judgment, the Court must construe all facts in the light most favorable to Chicago Marine and thus assume that Lenardson did make these alleged statements at the Chicago Boat Show. See *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006), as amended on denial of reh'g (May 25, 2006).

A statement is defamatory under Illinois law if "it tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person." *Huon v. Denton*, 2016 WL 6682931, at *2 (7th Cir. Nov. 14, 2016) (citing *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006)). To prove a defamation claim, "the evidence must show that a defendant made a false statement concerning the plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by the defendant, and that the plaintiff suffered damages as a result." *Giant Screen Sports v. Can. Imperial Bank of Commerce,* 553 F.3d 527, 532 (7th Cir. 2009) (citations omitted). Illinois law recognizes two types of defamation: defamation *per se* and defamation *per quod. Id.*

"A statement is defamatory *per se* if its defamatory character is obvious and apparent on its face and injury to the plaintiff's reputation may be presumed." *Muzikowski v. Paramount Pictures Corp.,* 477 F.3d 899, 904 (7th Cir. 2007) (citation omitted). A plaintiff does not need to prove actual damages to recover under a theory of defamation *per se*. *Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008). Illinois recognizes five categories of defamation *per se*, two of which are germane here: (1) statements that suggest that the subject can't perform his job because of lack of ability or want of integrity, and (2) statements that prejudice the subject in the pursuit of his trade or profession. See *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 613 (7th Cir. 2013). The difference between these two categories is subtle. The former implies "some sort of on-the-job malfeasance; the latter covers suitability for a trade of profession." *Id.*

A plaintiff may bring a defamation *per quod* claim when "the defamatory character of a statement is not apparent on its face and extrinsic evidence is necessary to demonstrate its injurious meaning or where a statement is defamatory on its face but does not fall under one of the categories of statements which are actionable *per se*." *Maag v. Ill. Coalition for Jobs, Growth & Prosperity*, 858 N.E.2d 967, 975 (Ill. App. Ct. 2006). "A plaintiff bringing a *per quod* claim must also plead and prove special damages to recover." *Id.; Muzikowski,* 322 F.3d at 927 (stating that an itemization of losses or an allegation of "specific damages of actual financial injury" is a "required element" of a claim for defamation *per quod*); *Robinson v. Morgan Stanley,* 2008 WL 4874459, at *5 (N.D. Ill. June 18, 2008) ("To allege an action for defamation *per quod* in federal court, [the plaintiff] must plead special damages in accordance with Illinois law and Federal Rule of Civil Procedure 9(g).").

Defendants argue that they are entitled to summary judgment as to Count V (Defamation *Per Quod*) because even assuming Lenardson did make these alleged false statements at the Chicago Boat Show, Chicago Marine is unable to produce any evidence supporting its claim of special damages from the alleged statements. The Court agrees. The complaint alleges that Lenardson's statements "impeach[ed] Chicago Marine's reputation, lower[ed] Chicago Marine in the estimation of the community, and deter[red] third parties from associating and doing business with Chicago Marine," that as a direct result of the alleged statements, "Chicago Marine has been damaged in its reputation and its business in an amount to be determined at trial." [6] [1, at ¶¶ 109, 112.] However, Chicago Marine has produced no evidence of "specific damages of

---

[6] The complaint also alleges that as a direct result of Lenardson's alleged statements to unidentified Coast Guard officers in St. Joseph and Michigan City, the Coast Guard stations in St. Joseph and Michigan City stopped referring boaters in need of salvage or towing services to Chicago Marine. [*Id.* at ¶ 113.] However, the Court has already granted summary judgment in favor of Defendants as to any statements allegedly made to the unidentified Coast Guard officers in St. Joseph and Michigan City, and Chicago Marine does not allege any connection between these claimed damages and Lenardson's alleged statements at the Chicago Boat Show.

actual financial injury," itemized losses that flowed from Lenardson's alleged statements, or proposed business opportunities that were lost due to the statements. Cf. *Pippen*, 734 F.3d at 614.

Additionally, Pearson testified that Lenardson's alleged statements did not change his opinion of Chicago Marine because he knew the statements were not true. [61-3, Exhibit 3 (Pearson Deposition), at 27, 32.] He explained that the alleged statements had no effect on him, just "like water off a duck's back." [*Id.* at 34.] Pearson did not mention the alleged statements to Manley until a month later and only did so in passing conversation because he did not think it was a matter of importance. [*Id.* at 35, 37.] Pearson did not stop working for Chicago Marine because of the alleged statements. [61-2, at ¶ 39.] Thus, even viewing the evidence in the light most favorable to Chicago Marine, as the Court must at this stage of the litigation, no reasonable jury could find that Chicago Marine suffered special damages from Lenardson's alleged statements at the Chicago Boat Show. The Court grants summary judgment in favor of Defendants on Count V.

Finally, the Court turns to Count IV (Defamation *Per Se*). Defendants acknowledge that damages are presumed for defamation *per se* claims. However, Defendants argue that by presenting Pearson's deposition testimony, they have rebutted this presumption and have shown that Chicago Marine has sustained no loss to its reputation. Defendants contend that they are thus entitled to summary judgment on Count IV. This argument fails because "[i]f a defamatory statement is actionable *per se*, the plaintiff need not plead or prove actual damage to his or her reputation in order to recover." *Dunlap v. Alcuin Montessori Sch.*, 698 N.E.2d 574, 580 (Ill. App. Ct. 1998). In a defamation per se case, "the 'injury' can be pretty invisible [and] the jury in such a case is permitted to award general damages even if there are no actual damages, no

demonstrable monetizable loss."  *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 917 (7th Cir. 1994).  Additionally, Defendants have not rebutted the presumption of damages.  Even assuming Pearson did not believe Lenardson's alleged statements, Pearson testified that others overheard Lenardson making these alleged statements about Chicago Marine at the Chicago Boat Show, which could have caused damage to Chicago Marine's reputation.  [See 61-3, Exhibit 4 (Pearson Deposition), at 32–33 (explaining that Peter Thompson, who was another Boat U.S. representative at the booth, two marketing representatives from Boat U.S., and Pearson's son also heard Lenardson's alleged statements).]  Thus, a reasonable jury could find for Chicago Marine on this claim, and Defendants' motions for summary judgment as to Count IV (Defamation *Per Se*) is denied.

## IV.  Conclusion

For the reasons explained above, the Court enters summary judgment in favor of Defendants on Plaintiff's claim for intentional interference with prospective economic advantage against Boat U.S. and the Great Lakes Defendants (Count III) and Plaintiff's claim for defamation *per quod* against Boat U.S. and the Great Lakes (Count V).  Defendants' motions for summary judgment [61] and [62] are denied as to Plaintiff's claim for breach of contract for wrongful termination against Boat U.S. (Count I), breach of implied covenant of good faith and fair dealing against Boat U.S. (Count II), and defamation *per se* against Boat U.S. and the Great Lakes Defendants (Count IV).  This case is set for further status hearing on January 24, 2017 at 10:30 a.m.

Dated: January 3, 2017

_____
Robert M. Dow, Jr.
United States District Judge