**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN J. MANLEY d/b/a CHICAGO MARINE TOWING, | ) ) | |
| | ) | Case No. 13-cv-5551 |
| Plaintiff, | ) ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) ) | |
| BOAT/U.S., Inc., a Virginia corporation, GREAT LAKES REPAIR, Inc., d/b/a GREAT LAKES TOWING & REPAIR, a Michigan corporation, and RICHARD N. LENARDSON, an individual and resident of Michigan, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER INCORPORATING FINDINGS OF
FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL**

In this diversity action, Plaintiff John J. Manley d/b/a Chicago Marine Towing ("Manley" or "Chicago Marine") brings two claims against Defendant BOAT/U.S., Inc. ("Boat U.S.") alone and three claims against Boat U.S., Great Lakes Repair, Inc. ("Great Lakes"), and Richard Lenardson ("Lenardson") (Great Lakes and Lenardson collectively, "the Great Lakes Defendants"). In ruling on the motions for summary judgment by the Great Lakes Defendants and Boat U.S. [77], the Court concluded that Chicago Marine had failed to raise a genuine issue of material fact on two of its claims and granted Defendants' motions on those counts, see [77, at 15–18, 20–21] but, also explained that material issues of fact remained as to three claims, see [*id.* at 12–15, 21–22]. The Court thus set the case for a trial on the remaining three claims. From July 11 to 13, 2018, the Court conducted a bench trial on those claims. Though the Court invited all the parties to submit purposed findings of fact and conclusions of law [129], only Defendants availed themselves of that opportunity [132–33].

The Court sets forth below its findings of fact and conclusions of law, as required under Federal Rule of Civil Procedure 52(a). The facts are drawn from the documentary record in the case and the evidence and testimony presented at trial. The Court makes all factual findings by a preponderance of the evidence. To the extent that any finding of fact may be more properly characterized as a conclusion of law, it should be so construed. Similarly, to the extent that any conclusion of law may be more properly characterized as a finding of fact, it should be so construed. The Court has endeavored to indicate with citations to the record the testimony and other evidence on which it has relied in making findings of fact and has noted those instances in which its findings have been influenced by credibility determinations.

After considering the admissible evidence and assessing the credibility of the witnesses, the Court concludes that Chicago Marine has failed to prove by a preponderance of the evidence that: (1) Boat U.S. wrongfully terminated, and thus breached, its contract with Chicago Marine (Count I); (2) Boat U.S. breached the implied covenant of good faith and fair dealing within the same contact (Count II); and (3) that Defendants defamed him *per se* (Count IV). Accordingly, the Court finds for the Defendants and against Chicago Marine on Counts I, II, and IV of the complaint [1]. This matter is set for further status hearing on April 18, 2019, at 9:00 a.m. to discuss whether Defendants wish to pursue their counterclaims. If Defendants are content to voluntarily dismiss their counterclaims, they may so indicate by filing a joint status report on the docket any time prior to the next status hearing and the Court will enter a final judgment consistent with Federal Rule of Civil Procedure 58. Finally, Defendants' motion for monetary sanctions [96] is stricken without prejudice pursuant to Defendants' "statement regarding request for monetary sanctions" [131] filed on February 22, 2019.

## I.     Procedural Background

To say that the litigation between Chicago Marine and Defendant has been long running would be an understatement.  On August 2, 2013, Chicago Marine filed a five-count complaint against Defendants alleging breach of contract for wrongful termination against Boat U.S. (Count I), breach of the implied covenant of good faith and fair dealing against Boat U.S. (Count II), intentional interference with prospective economic advantage against Boat U.S. and the Great Lakes Defendants (Count III), defamation *per se* against Boat U.S. and the Great Lakes Defendants (Count IV), and defamation *per quod* against Boat U.S. and the Great Lakes Defendants (Count V).  [1.]  Shortly thereafter, Defendant Boat U.S. moved to dismiss Counts II, III, and V, and the Great Lakes Defendants moved to dismiss Counts III and V.  [12]; [15].  The Court denied both motions on April 23, 2014.  [21 (*Manley v. Boat/U.S. Inc.*, 2014 WL 1647117, at *1–2 (N.D. Ill. Apr. 23, 2014)).]

In June 2014, Boat U.S. filed its first amended answer [34] and raised nine counterclaims against Chicago Marine including breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), trademark infringement under 15 U.S.C. § 1114 (Count III) and under common law (Count VI), trademark dilution under 15 U.S.C. § 1125(c) (Count IV) and under the Illinois Trademark Registration and Protection Act, 765 ILCS 1036/65 (Count IX), false designation of origin under 15 U.S.C. § 1125(a) (Count V), unfair competition (Count VII), and violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq. (Count VIII).  Chicago Marine moved to dismiss many of Boat U.S.'s counterclaims.  [35.]  On December 12, 2014, the Court granted the motion to dismiss with respect to Count IX for trademark dilution under the Illinois statute and denied the motion with respect to all of the other counts.  [46.]  On May 29, 2015, Chicago Marine filed its second amended answer [51] to Defendants'

counterclaims, raising sixteen affirmative defenses. On March 29, 2016, the Court granted Boat U.S.'s motion to strike [54] all of these affirmative defenses. [66.]

On March 18, 2016, Boat U.S. filed a motion for summary judgment [61], which was joined by the Great Lakes Defendants [62]. The Court adopted the parties' proposed briefing schedule. See [64]. However, despite having been granted an extension of time to file its response, Chicago Marine filed its response brief more than five months after the new deadline, without leave of the court. On November 28, 2016, the Court denied Chicago Marine's motion for leave to file its response brief *instanter* [72] and struck the response and supporting materials filed without leave of the court [60, 70]. See [75]. The Court subsequently concluded that Chicago Marine had not come forward with a genuine issue of material fact on Counts III and V and therefore granted Defendants' motions. See [77 (*Manley v. Boat/U.S., Inc.*, 2017 WL 24712 (N.D. Ill. Jan. 3, 2017).] However, the Court also concluded that genuine issues of material fact remained on Counts I, II, and IV. See [*id.*] After denying Boat U.S.'s motion for reconsideration [84] on November 19, 2017, see [87, (2017 WL 5191952 (N.D. Ill. Nov. 9, 2017))], the Court set the case for trial after bifurcating the issue of Boat U.S.'s counterclaims, [89].

By agreement of the parties, the case proceeded to a bench trial on Counts I, II, and IV from July 11–13, 2018. [124–26.] Once the trial transcripts were ready, on February 7, 2019, the Court ordered the parties to submit any proposed findings of fact and conclusions of law that they wished to submit by March 8, 2019. [129.] Only Defendants did so. [131–32.]

## II.    Findings of Fact[1]

Manley operates Chicago Marine as a sole proprietorship that provides marine recovery services including towing, assisting, and salvaging vessels on Lake Michigan. [134, at 18:4–13,

---

[1] Despite an invitation to do so and being warned that the deadline was a firm one and that the Court would issue its opinion by March 31, 2019, Chicago Marine failed to file any proposed findings of fact or

20:7–24:3.]  The company at one time or another received business through calls from the United States Coast Guard, the Chicago Park District, the Wilmette Park District, the Waukegan Harbor Port District, the Kenosha Harbor Port District, boaters directly, and Boat U.S.  [*Id.* at 25:19–26:8.] Boat/U.S., Inc., a Virginia corporation, provides water towing services, 24-hour dispatch service, and insurance coverage for recreational boaters.  [77, at 2.]  Great Lakes is the current Boat U.S. licensee for ports along the coast of Lake Michigan from Chicago to Traverse City, Michigan. [137, at 85:7–86:3, 90:20–91:2.]  Lenardson is the owner and controlling officer/manager of Great Lakes.  [*Id.* at 83:19–84:2.]  Great Lakes replaced Manley as the Boat U.S. licensee for the ports in Illinois and Indiana after Boat U.S. terminated the License Service Agreement between it and Chicago Marine.  [*Id.* at 48:23–24.]

## A.    The License Service Agreement

Prior to July 23, 2012, Chicago Marine served as the Boat U.S. licensee for all the ports from Kenosha, Wisconsin to New Buffalo, Indiana.  [134, at 20:7–19]; [Tr. Ex. JEX-4, at 21–24]; [Tr. Ex. JEX 9].  Chicago Marine became a licensee of Boat U.S. in February 2009, when it entered into a License Service Agreement (the "LSA") with Boat U.S.  [Tr. Ex. JEX-4, at 14.[2]]  Section I, Item 14(a)–(b) of the LSA provided that the LSA would remain in effect until November 30, 2013, absent Chicago Marine's breach of Section I, Items 3, 4, 9, 10, or 11 of the LSA.  [*Id.* at 11.] Chicago Marine's breach of any of those provisions entitled Boat U.S. to immediately terminate the LSA.  [*Id.*]  Relatedly, Section I, Item 14(f) of the LSA provided that (except in certain cases) "any party which is delivered written notice of a breach and subsequent Termination under this Agreement may within 10 days of such notice request a hearing by the Termination Review Board

_____

conclusions of law by the Court-imposed deadline of March 8, 2019—and, indeed, has not filed any brief at all even as of the date of this decision.

[2]  Tr. Ex. JEX-4 was authenticated by Plaintiff at trial.  [134, at 24:4–15.]

("TRB")." [*Id.* at 12.] Finally, Section I, Item 17(e) of the LSA provided that the LSA would be governed by the laws of the Commonwealth of Virginia. [*Id.* at 13.]

## B.    July 1, 2012 Salvage Operation

When Nathan Locher's boat became grounded on July 1, 2012, he called Boat U.S. for assistance sometime between 2:00 and 3:00 p.m. [138, at 6:7–18.] Shortly thereafter, at 2:45 p.m., Boat U.S. contacted Chicago Marine to assist Locher. [134, at 41:16–21, 45:19–24]; [135, 97:21–98:1]. Albert Bartkus, one of Plaintiff's towboat captains, was the first person from Chicago Marine to reach Locher's grounded vessel. [136, at 4:1–20, 13:3–5.] At the time, Bartkus was operating a "lettered boat" with the TowBoatUS red hull and TowBoatUS logo and was wearing a shirt inscribed with "TowBoatUS" and its logo. [*Id.* at 26:6–22.] When Bartkus arrived, neither Locher nor his then-girlfriend, now-spouse, Laurie Jagla (collectively, the "Lochers"),[3] were on the boat. Both were in the water and began to approach Bartkus once he arrived on the scene. [*Id.* at 26:23–27:2.] The parties dispute what happened next.

### 1.    Locher's Account

Locher testified at trial that before he freed the boat, Bartkus asked where Locher wanted his boat towed and that Locher asked him to tow it to his home marina, Marina Shores in Portage, Indiana. [138, at 10:7–16.] Bartkus did not inform Locher that he would not have access to the boat after it was towed. [*Id.* at 11:9–11.] At this point, all of Locher's clothes were on the boat and he only had the swimming trunks that he was wearing along with his wallet, phone, and keys that were in Jagla's purse. [*Id.* at 11:12–15; 24:5–26:20.] After the boat was freed, Manley arrived in a second boat bearing the TwoBoatUS logo. [*Id.* at 11:20–12:6.]

---

[3] By the time of trial, Locher and Jagla had married. [138, at 16:19–17:1.]

6

Shortly after the Lochers boarded the boat, Locher noticed that the boat was being towed in the opposite direction of his home marina and asked Manley where the boat was being taken. [*Id.* at 12:10–13.] Locher testified that Manley responded that Chicago Marine was taking the boat until Locher's insurance paid for the tow. [*Id.* at 12:15–21.] When Locher followed up and asked where the boat was being taken, Manley refused to tell him, nor would he allow the Lochers to get their personal items off the boat. [*Id.* at 13:2–10.] Although Locher testified that he never threatened Manley, Locher became concerned and upset when Manley refused to provide information about or access to the boat and stated, "You just stole my boat. How would you like it if I threw you overboard and took your boat?"[4] [*Id.* at 13:11–14:2.] In response, Locher testified that Manley drew a handgun, chambered a round, and stated, "You ain't going to do anything, and I'll put two bullet holes in your nipple rings." [*Id.* at 14:17–25.] Locher asserted that he never raised his hands at Manley, reached towards Manley, threatened to use a weapon, or reached toward any kind of weapon before Manley pulled his gun. [*Id.* at 14:5–25.] In fact, Locher testified that he was seated at the back of the boat for the entire exchange. [*Id.* at 14:3–4.] After Manley drew his weapon, there were no further incidents and Manley dropped the Lochers off at their home marina. [*Id.* at 15:20–16:4.]

### 2. Bartkus/Manley Account

Bartkus testified that he did not ask where the Lochers wanted the boat towed after he freed it, nor did he inform them where the boat would be taken because he did not know at that point where the boat should be taken. [136, at 28:13–22.] At some point after the boat was freed, Manley instructed Bartkus to take the Lochers's boat to Crowley's Yacht Yard ("Crowley's") in Chicago. [*Id.* at 20:10–23.] Bartkus further explained that Manley was coming to discuss the

---

[4] Locher also testified that he repeatedly asked Manley if he could pay for the salvage and tow and get the boat back, but that Manley rebuffed him asserting that he could not afford it. [138, at 33:25–34:24.]

situation with the Lochers. [*Id.* at 20:21–3.] Shortly after Bartkus began towing the boat away, Manley arrived at the beach in a "lettered" TowBoatUS boat to find the Lochers. [135, at 10:24–11:6, 14:1–5.] Manley asserted that after finding them, the first thing he noticed was Locher finishing off a can of beer and dropping it on the beach. [*Id.* at 12:13–14.] According to Manley, when the Lochers finally climbed on board both were "glassy-eyed" and clearly intoxicated. [*Id.* at 13: 14–18.] Shortly after Manley began to take them back to their marina, Jagla began yelling that the other boat was towing their boat in the wrong direction. [*Id.* at 16:8–10, 16:18–19.] At that point, Manley testified that he drove his boat further offshore, and then stopped and made a few phone calls. [*Id.* at 16:22–17:1, 17:23–19:1.]

After making those phone calls, Manley told the Lochers that Chicago Marine was taking the boat to a boatyard. [*Id.* at 19:2–7.] The Lochers then allegedly began "yelling and screaming" that they wanted access to their boat right now. [*Id.* at 24:19–20, 25:3–4.] According to Manley, he then explained that he could not give them access to the boat because Chicago Marine did not allow "open-water personnel transfers" because they were too dangerous"[5] and said that they were going to take the Lochers's boat and haul it out of the water to check for damage. [*Id.* at 25:3–8.] In response to Locher's continued insistence that he needed something off the boat, Manley testified that he offered to take Locher to Michigan City and then drive him wherever he needed to go, but that he could not take him to the boatyard because Chicago Marine's agreement with Crowley's only allowed Chicago Marine personnel to enter the yard. [*Id.* at 25:17–26:5.] Importantly, Manley testified that he never told Locher where he was taking his boat because he "did not want him going down there and trying to climb over the bench or do some other stupid

---

[5] In particular, Manley asserted that it would have been extremely dangerous to allow a drunk person to attempt to get on the boat several miles from shore. [135, at 28:20–29:3.]

thing, which, in my opinion, he was completely capable." [*Id.* at 36:10–13.] Manley also explained that he would not take the Lochers's boat back to their home marina, and that Locher would not be able to access his boat that night. [*Id.* at 26:6–12.][6]

At that point, Manley asserts that Locher stated, "If you don't take me back to my boat right now, I'm going to beat the shit out of you, throw you over the side, and take this boat and go get my boat." [*Id.* at 135:15–17.] Locher also took two steps toward Manley, stopped next to several possible "weapons," and began eyeing them. [*Id.* at 26:18–24.] At that point, because he felt he was in "serious physical jeopardy," Manley produced his handgun and ordered Locher to "sit down on the transom and stay there." [*Id.* at 27:22–28:6.] Locher complied and Manley took the Lochers the rest of the way to their home marina. [*Id.* at 28:7–8, 34:13-19.]

### 3. Testimony Regarding the Lochers' State of Mind

Given the alleged events above, the Lochers' state of mind during the salvage operation is heavily contested. In his 2015 deposition, Bartkus testified that he did not believe that either of the Lochers were intoxicated or under the influence of drugs:

> Q    Okay, did you observe anything about either the male or the female that would suggest to you they were under the influence of drugs or alcohol? Slurred speech, you know, difficulty standing, the types of things that you would observe?
>
> A    At that time, no.

[*Id.* at 31:20–32:2 (quoting [61-3], at 66 (Bartkus Dep. 31:20–32:1)).] At trial however, Bartkus asserted that he did believe they were intoxicated. [136, at 30:23–31:2] Confronted with his previous testimony, Bartkus responded that he did not remember that testimony and that "certain things retain in my memory better than others." [*Id.* at 32:3–32:11.] Moreover, even at trial, Bartkus affirmed his previous deposition testimony that "[the Lochers] seemed coherent, and you

---

[6] In correspondence with Boat U.S. following the incident, Manley never claimed that he denied access to their watercraft because Crowley's was closed. See, e.g., [Tr. Exs. JEX-6, JEX-9, CMT-5].

know, they cooperated with what I needed to do, you know, my job." [*Id.* at 33:22–34:21 (quoting [61-3], at 66 (Bartkus Dep. 31:10–12)).] Bartkus further affirmed that he was happy he had been able to negotiate with the Lochers because on occasions he had been unable to negotiate with distressed boaters. [*Id.* at 34:18–21.] Specifically asked if either of the Lochers had threatened him at any time, or had been belligerent at any time, Bartkus responded "no." [*Id.* at 34:22–35:1.] In fact, Bartkus confirmed that the Lochers had expressed a great deal of concern for their boat, and that they appeared to care a great deal for their boat. [*Id.* at 35:4–8.] Finally, Bartkus testified that prior to his deposition in 2015, Manley had never told Bartkus about the alleged altercation on his boat, that he had feared for his life, or that he had drawn a loaded handgun and threatened to shoot the boaters. [*Id.* at 36:23–37:21.]

Locher's testimony largely echoed that of Bartkus. Locher testified that before the storm he had consumed approximately three beers, but had stopped drinking after the storm hit and he realized that he might have to deal with the Coast Guard. [138, at 8:12–25.] He further testified that he was not intoxicated when Bartkus or Manley arrived, and had not consumed any illicit drugs that day. [*Id.* at 9:1–8.] Locher also testified that he was subject to random drug testing as a union member. [*Id.* at 9:9–10.] Furthermore, as previously noted, Locher also testified that he never made any aggressive moves towards Manley, with the exception of his comments about Manley's alleged theft of his boat.

Conversely, Manley testified that the couple was clearly intoxicated—he also believed that the couple had taken some form of drugs—and that Locher made threatening moves toward him and he felt he was in "serious physical jeopardy." [135, at 26:25–27:1; 27:18–28:6.] Additionally, in correspondence to Boat U.S. following the incident, Manley told Boat U.S. that he would no longer provide service to "anyone with a Mohawk and pony tail, wearing any type of gang

insignia/tattoos, particularly with nipple rings." [Tr. Ex. JEX-6]; [137, at 23:9–12].[7] Manley also repeatedly referred to Locher as "DUB" ("Doped Up Biker"), Jagla as "DUBB" ("Doped Up Biker Bimbo"), and both Lochers as "absolute morons," "doped up morons," "savage morons," and "dopers" in the same correspondence. [Tr. Ex. JEX-6]; [137, at 5:7–7:6].

### 4. The Court's Findings

The Court finds Bartkus's deposition testimony more credible than Manley's or Bartkus's trial testimony. First, Bartkus's deposition occurred nearly three years before the trial and Bartkus acknowledged that his memory deteriorated over time. Furthermore, neither Bartkus nor Locher are parties with a direct interest in the outcome of this trial. The Court therefore concludes based on Bartkus's and Locher's testimony (1) that the Lochers were neither intoxicated, nor belligerent, during the events described above; (2) that Locher only became agitated after Manley refused, without basis, to provide Locher with information about or access to his boat after Locher realized that the boat, which he had understood would be taken to his home port, was being towed in the opposite direction; and (3) that it was Manley who escalated the situation by drawing his weapon. Nor does the Court credit Manley's testimony that he explained that he could not give them access to the boat because Chicago Marine did not do "open-water personnel transfers" and that Crowley's would be closed, or that Manley was afraid to tell Locher where he was taking the boat because Manley feared he would try to break into Crowley's yacht yard. Manley testified that he would have immediately given Locher the boat back if Locher had paid him on the water, [138, 157:11–158:18; 160:7–11], but Locher testified that he repeatedly offered to pay and that Manley rebuffed him with a curt: "you can't afford it." [*Id.* at 34:2–24.]

---

[7] Locher has never been a member of a motorcycle gang, does not have any gang tattoos, nor was he wearing any type of gang insignia on the day in question. [138, at 20:17–21:2, 67:6–9.]

## C. Termination of the LSA and Fallout

Locher was not told the location of his boat or given access to the boat and his personal property until the day after the salvage, July 2, after Manley telephoned him and gave a fake name. [135, at 36:19–37:9, 56:14–20]; [136, at 115:2–11]. After being informed where the boat was being held, Locher went to Crowley's to remove his personal belongs from the boat, including his work boots and various articles of clothing. [138, at 43:1–44:21.] A few days later, Locher called the Department of Natural Resources to report Manley's behavior and an officer came out to take a report. [*Id.* at 17:4–12.]

On July 2, 2012, Locher and his insurer, American Family Insurance, complained to Boat U.S. regarding Chicago Marine's handing of the July 1, 2012 salvage operation and Manley's refusal to grant Locher access to his vessel and property. [137, at 17:16–19, 120:21–121:1, 137:3–6.] Boat U.S. promptly conducted a thorough investigation of the complaints, which included in-person interviews with Locher, Jagla, and Manley, and consultation with outside legal counsel. [138, at 133:2–133:23.] On July 23, 2012, after the conclusion of its investigation, Boat U.S. delivered a letter to Manley that terminated the LSA, effective immediately. [Tr. Ex. JEX-5], [137, at 24:17–25:16]; [138, at 137:16–24].

The notice put forward four separate and independent breaches of the LSA allowing for immediate termination. See generally [Tr. Ex. JEX-5]. Of particular importance here, Boat U.S. asserted that Manley had violated Section I, Item 10 of the LSA which required Chicago Marine to comply with "all applicable federal, state and local laws, regulations, ordinances, and rules." [Tr. Exs. JEX-4, JEX-5.] Although Boat U.S. could have ended the LSA by unilaterally refusing to renew the LSA in November 2013, as permitted by Section I, Item 14(a), Boat U.S. felt compelled to terminate the LSA given its belief that Chicago Marine had materially breached the LSA. [138, at 141:12–143:23.] In particular, Jerry Cardarelli, a vice-president at Boat U.S.,

testified that Boat U.S. was very concerned with its possible legal exposure due to Manley's carrying of, and in this case threatening the use of, a sidearm. [*Id.* at 89:20–22, 142:24–143:5.] Finally, despite Boat U.S.'s repeated references to Manley's right to a hearing before Boat U.S.'s Termination Review Board, Manley never requested such a hearing. [*Id.* at 140:16–141:11.] The LSA therefore ended on July 23, 2012.

After Boat U.S. terminated the LSA, Chicago Marine received three salvage jobs and one tow from July 23, 2012 to July 11, 2018. [135, at 64:17–20.][8] This marked a substantial reduction from Chicago Marine's prior business. [*Id.* at 64:24–65:6.] The loss of the Boat U.S. license effectively reduced Chicago Marine's business to zero. [135, at 67:7–20]; [137, at 51:8–10, 52:17–22]. Consequently, since 2012, Chicago Marine has had to liquidate assets and lay off staff as a result of the termination. [135, at 67:23–25]; [137, at 52:1–4, 65:21–24]. However, even prior to the LSA's termination, Manley had not reported a personal profit from the business for at least five years prior to the termination. [135, at 70:5–9.][9] For example, Plaintiff's 2011 tax return reported a net loss of -$251,241 for Chicago Marine in 2011. [Tr. Ex. CMT-12.] Similarly, Manley did not show a profit and reported a negative adjusted gross income from 2006–2010. [Tr. Ex. CMT-14]; [135, at 74:14–77:5].

Regardless of Chicago Marine's ability to continue as a going concern, Manley asserts that the LSA's termination derailed a firm agreement that he had had to sell Chicago Marine to Paul Walk and that they had been in the process of reducing the agreement to paper when the

---

[8] Manley later testified that Chicago Marine had done approximately six tows and one salvage operation since 2012. [137, at 52:17–18.]

[9] The Court does not credit Manley's testimony that Chicago Marine would have produced a profit if he had not put the profit he made back into the company given the lack of documentary evidence supporting that assertion. See [135, at 74:1–10 (noting in response to an objection by Boat U.S. the weakness of assertions without documentary evidence)].

termination occurred. See [135, at 78:22–81:6]. However, Walk testified that he did "very, very little due diligence" into a possible sale [136, at 82:15–18], did not open or review a binder of financial documents that Manley gave him [*id.* at 83:15–84:3], never agreed to a firm purchase price for Chicago Marine [*id.* at 88:20–23], and that the two never prepared a letter of intent, [*id.* at 80:6–7]. In fact, the only thing Walk remembered reviewing was a list of Chicago Marine's assets, but he could not remember its contents or the value of the assets. [*Id.* at 76:4-77:18, 89:3–20.] Based on this testimony, and Walk's position as a disinterested party in this litigation, the Court concludes that there was never a firm agreement between Manley and Walk to sell Chicago Marine to Walk.

### D. The January 2013 Chicago Boat Show

The January 2013 Chicago Boat Show ("the Boat Show"), was a maritime industry event that occurred at McCormick Place. [136, at 42:8–24.] Boat U.S. had a booth at the Boat Show to market its services. [*Id.* at 43:21–44:4.] The booth was eight-by-eight and at the end of an aisle. [137, at 87:22–88:1–3.] At that booth, Keith Pearson and Lenardson had a conversation. [136, at 44:10–12]; [137, at 89:5–12]. Once again, the parties heavily contest the content of that conversation.

#### 1. Pearson's Account

Keith Pearson worked for Chicago Marine as a towboat captain when the company was still a Boat U.S. licensee. [136, at 57:14–24]; [Tr. Ex. JEX-4, at 43]. Pearson provided towing, salvage, repair, and operations services. [136, at 39:9–11, 15–19.] In fact, Pearson's business cards—which had been provided by Chicago Marine—stated that he was a captain for Chicago Marine. [*Id.* at 49:7–25, 50:7–9.] He also referred to Chicago Marine's office manager as "our" office manager during the trial. [*Id.* at 50:10–14.] Either Manley or Chicago Marine's office manager would dictate what work Pearson did for Chicago Marine. [*Id.* at 50:15–17.] Importantly,

Pearson explained at trial that he is hard of hearing and has been hard of hearing since before January 2013. [*Id.* at 39:14, 52:5–8.]

Pearson attended the Boat Show with his son and explained that he had previously looked Lenardson up on Facebook to see who had received Chicago Marine's former Boat U.S. business. [*Id.* at 42:8–24, 44:21–24, 57:14–24.] Pearson asserts that some time after he arrived at the Boat U.S. booth with his son and began speaking with Lenardson, Lenardson stated, "Do you know that Chicago Marine Towing has gone out of business and that Mr. Manley has lost his license?" [*Id.* at 44:21–45:6.] Pearson asserts that in addition to him and his son, two Boat U.S. marketing "girls" were also present for his conversation with Lenardson. [*Id.* at 44:21–24.][10] However, despite working with the marketing "girls" every year at least the five preceding years before that, Pearson could not recall their names. [*Id.* at 51:10–19.] Finally, Pearson did not inform Manley of the remarks until late January or early February 2013. [137, at 44:18–24.]

### 2. Lenardson's Account

Lenardson denies making the statements as alleged by Pearson. [137, at 90:12–20.] In contrast to Pearson's testimony, Lenardson remembers briefly speaking with Pearson alone, without his son present. [*Id.* at 89:5–12.] Furthermore, he remembered only one Boat U.S. marketing representative and could provide her name at trial. [*Id.* at 88:4–10.] Lenardson contends that Pearson offered Great Lakes his services as a salvage captain, [*id.* at 91:12–92:6], and that he politely declined the offer, [*id.*].

### 3. The Court's Findings

The Court finds that it is more likely than not that Lenardson did not make the allegedly defamatory statements. Pearson acknowledged that he is hard of hearing, and in response to

---

[10] Manley did not call either Pearson's son, or either of the two "marketing girls" at trial.

Lenardson's categorical denial that he did not say any of the statements, Manley failed to produce any of the other individuals who allegedly heard the comment. Moreover, given Pearson's longtime friendship with Plaintiff, the Court finds his testimony less likely to be free from bias. Thus, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Lenardson stated that (1) Manley had lost his license and that (2) Chicago Marine had gone out of business.

## III. Analysis & Conclusions of Law[11]

### A. Count I: Wrongful Termination of Contract and Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

To prove a breach of contract under Virginia law,[12] Chicago Marine must prove that (1) Boat U.S. owed a legal obligation to it; (2) Boat U.S. violated or breached that obligation; and (3) that Chicago Marine suffered an injury or damage as a result of that breach. *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004); *Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia*, 715 F.3d 501, 517 (4th Cir. 2013). Similarly, to succeed on its claim of beach of the implied covenant of good faith and fair dealing incumbent in every contract, Chicago Marine must show that Boat U.S. exercised its discretion to terminate the contract in bad faith. *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998). If, however, Boat U.S. had good cause to breach the contract, then Chicago Marine cannot prove a breach of the implied covenant of good faith and fair dealing as a matter of law. *Charles E. Brauer Co. v. NationsBank of Virginia, N.A.*, 466 S.E.2d 382, 386 (Va. 1996)

---

[11] The Court again notes that Manley did not file any purposed findings of fact or conclusions of law. Nonetheless, even if he had, as the Court explained above, the evidence clearly weighs against him.

[12] As the Court previously established, see, e.g., [21], Virginia law applies in this case given the LSA contained a choice of law provision establishing Virginia law as the law of choice.

Plaintiff has failed to prove by a preponderance of the evidence that Boat U.S. breached the LSA when it terminated the agreement on July 23, 2012, or that it terminated the agreement in bad faith. Specifically, Plaintiff has failed to show that Boat U.S. could not terminate the LSA on any of the grounds cited in its notice of termination dated July 23, 2012. As the Court suggested in its order denying summary judgment on these claims [77, at 15], the only question left for trial was whether Chicago Marine could legally refuse (1) to tell Locher and Jagla where their boat was being taken or (2) to grant them access the boat to collect their belongings. As explained below, the Court concludes that Chicago Marine's refusal to do both (1) and (2) breached maritime law, providing Boat U.S. with good cause to terminate the LSA. Moreover, even if Boat U.S.'s termination of the agreement were invalid—which, to be clear, it was not—the evidence Chicago Marine put forward to support its claim of damages is entirely speculative and therefore inadequate to prove the third element of a breach of contract claim.

Salvage law incentivizes potential salvors to render voluntary and effective aid to people and property in distress at sea. *R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel*, 435 F.3d 521, 531 (4th Cir. 2006). "Without some promise of remuneration, salvors might understandably be reluctant to undertake the often dangerous and costly efforts necessary to provide others with assistance." *Id.* (citing *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 962 (4th Cir. 1999). Importantly, salvage law recognizes and assumes that the property being salvaged is owned by another and thus has not been abandoned. *Hener v. United States*, 525 F. Supp. 350, 356 (S.D.N.Y. 1981).

Particularly relevant to this case, the law of salvage provides a maritime law lien on the salvaged property to secure payment of the award. See *R.M.S. Titanic, Inc.*, 435 F.3d at 531; *Hener*, 525 F. Supp. at 356. The lien allows the salvor to take possession of the salvaged vessel

for the purpose of saving it from destruction, damage, or loss and retain it until proper compensation has been paid. *Id.* The lien attaches to the exclusion of all others, including other potential salvors and even the property's true owner. *R.M.S. Titanic, Inc.*, 435 F.3d at 531. Nevertheless, while the law gives the salvor this limited possessory interest in the salvaged property, the true owner is not divested of title to the property. *Id.* Correspondingly, the salvor's right to retain possession is not absolute and is instead "dependent upon conditions affecting the mutual rights of the salvor and owner." *The Alcazar*, 227 F. 633, 655 (E.D.N.C. 1915). "There seems to be no hard and fast rule prescribing the relative right and duty of the owner and the salvor in regard to the time of, or condition upon which, exclusive possession may be held by the salvor." *Id.* at 656. Courts have held that unless there is a probability that the owner would remove the vessel beyond the jurisdiction of the court, possession should be surrendered to the owner upon demand, "at least to the extent of permitting him to come on the vessel and aid in taking care of her." See, e.g., *id.* However, "if the vessel is, at the time of the demand by the master, in such critical position that there may be risk of loss or damage to her unless the salvors are allowed to complete their operations, it seems that they may retain possession pending such completion." *Id.* (citation and internal quotation marks omitted). Salvage law imposes on salvors the "duties of good faith, honesty, and diligence in protecting the property in [the] salvors' care." See *R.M.S. Titanic, Inc.*, 435 F.3d at 532 (alteration in original) (citation and internal quotation marks omitted).

At summary judgment, and now after trial, Boat U.S. asserts that Chicago Marine failed to show it had a legal right to refuse to inform Locher where it was towing his vessel and deny Locher and Jagla access to their property on the boat. The Court agrees. Chicago Marine certainly had the right to protect the vessel in its care and could retain possession of it pending the completion

of its salvage, *i.e.* payment of the salvage fee. However, it is a well-established principle of maritime law that after a vessel has been brought to a place of safety, "[a]ny untoward action to exclude the owner or his representatives to visit the property for inspection or similar purposes could be regarded as misconduct on the salvor's part." See 3A BENEDICT ON ADMIRALTY § 153 (2018) (citing *The Alcazar*, 227 F. 633); see also *The Hyderabad*, 11 F. 749, 757 (E.D. Wis. 1882) ("[I]t is not permissible * * * for the salvors to unreasonably exclude the master and crew of the wrecked vessel from all relation to and interest in the property.") Thus, maritime law required Chicago Marine to inform Locher where his boat would be held until he paid and to provide access to the boat so that the Lochers could collect their belongings. Chicago Marine's refusal to do so was a violation of maritime law.

As the Court found above, Chicago Marine had no reason to believe that informing Locher where the boat was being taken, or allowing him to access the boat, would have placed the vessel, and therefore Chicago Marine's ability to collect on the maritime lien, in danger. Indeed, the Court concludes that it was Manley's wrongful refusal to provide information about the boat's whereabouts or allow Locher to access to the boat—not Locher's impaired condition or his "belligerence" toward Manley—that precipitated the confrontation that led to Manley pointing a loaded handgun at Locher. Prior to Manley's actions, Locher and Jagla had cooperated with Chicago Marine's employees, namely Bartkus, and demonstrated that their primary concern was the boat and its safety. While they may have been drinking earlier in the day, the Court credits Locher's testimony, reinforced by Bartkus's deposition testimony, that the Lochers were not inebriated or "high" when Chicago Marine arrived and only displayed hostility, if any, after Manley's actions. The most plausible explanation for accepting Locher's testimony is common

sense: once his boat ran aground, his surmise that he might have to deal with the Coast Guard in some fashion provided an incentive for sobriety.

In sum, because Manley has failed to prove that he could legally refuse to tell Locher where his boat was being taken or deny Locher access to the boat, the Court concludes that Chicago Marine violated maritime law and that as a result, Boat U.S. had good cause to terminate the LSA pursuant to Section I, Items 10 & 14 of the LSA. See [Tr. Ex. JEX-14, at 10, 11]. Thus, Chicago Marine has failed to prove Boat U.S. breached the contract, or that Boat U.S. exercised its discretion to terminate the LSA in bad faith.

In any event, even if Boat U.S. lacked proper cause to terminate the LSA, Chicago Marine has failed to prove that it suffered any damages from the purported breach. At trial, the only theory of damages Chicago Marine even perfunctorily put forward was that the termination of the LSA led to the cancellation of a purported contract to sell Chicago Marine to Walk.[13] However, as noted above, Walk testified that he did "very, very little due diligence" into a possible sale, did not open or review a binder of financial documents given to him by Manley, never agreed to a firm purchase price, and that that no letter of intent was ever prepared. In fact, the only thing Walk remembered reviewing was a list of Chicago Marine's assets, but he could not remember its contents or the value of the assets. This testimony directly contradicted Manley's, who suggested that the two had been reducing the agreement to paper when Chicago Marine received the termination notice from Boat U.S. As noted above, the Court finds Walk's testimony far more persuasive and thus concludes that the purported deal between Manley and Walk was much too

---

[13] As noted above, the evidence at trial established that Chicago Marine itself had a net loss of $250,241 in 2011, and from 2006–2010, Manley reported a negative income for he and his wife. Manley testified that their only sources of income during this period was Chicago Marine, his wife's pension, and his pension.

speculative to support any claim of damages. See *Boggs v. Duncan*, 121 S.E.2d 359, 363 (Va. 1961) (reversing verdict where there was "no evidence upon which the alleged loss of profits can be ascertained or calculated with reasonable certainty").

For the reasons set for above, the Court concludes that Chicago Marine has failed to prove either that Boat U.S. breached the contract or that he suffered damages as a result, or that Boat U.S. exercised its discretion to terminate the contract in bad faith. Defendant Boat U.S. therefore is entitled to judgment on Counts I & II.

### B.    Count IV — Defamation *Per Se*

To prove defamation *per se* under Illinois law, Chicago Marine must prove that (1) Defendants made a false statement about Chicago Marine; (2) that Defendants made an unprivileged publication of that statement to a third party; and (3) that this publication caused damages. *Solaia Technology, LLC v. Specialty Publishing Co.*, 852 N.E.2d 825, 838 (2006). As explained above, the Court has found that Plaintiff has not shown by a preponderance of the evidence that the alleged false comments were made. Plaintiff therefore has failed to prove an element of his claim of defamation and Defendants Great Lakes and Lenardson are entitled to judgment on Count IV.

### IV.    Conclusion

For the foregoing reasons, the Court concludes in favor of Defendants and against Chicago Marine on Counts I, II, & IV. This case is set for further status hearing on April 18, 2019 at 9:00 a.m. unless the remaining counterclaims are voluntarily dismissed before that date.

Dated: March 27, 2019

Robert M. Dow, Jr.
United States District Judge